# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

MAR-NIQUE SIMON,

      Plaintiff,

  v.

DOMINGO URIBE,

      Defendant.

Case No. 09-cv-05859-TEH

**ORDER FINDING PETITIONER ELIGIBLE FOR EQUITABLE TOLLING AND DENYING RESPONDENT'S MOTION TO DISMISS**

      Petitioner Mar-Nique Simon, a state prisoner, filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In response to Respondent's motion to dismiss the petition as untimely, Petitioner presented extensive evidence that his intellectual disability made it impossible for him to meet the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996. Having held an evidentiary hearing and carefully reviewed the extensive record in this case, the Court finds that Petitioner is entitled to equitable tolling due to severe mental impairment. Respondent's motion to dismiss is hereby DENIED.

## BACKGROUND

      Petitioner Mar-Nique Simon ("Petitioner" or "Simon") pleaded no contest to attempted murder and second degree robbery on December 22, 2003. He was sixteen years old at the time. Three months later, on March 1, 2004, he was sentenced to twenty years in state prison. ECF No. 1 at 2-3. He did not appeal his conviction.

      On September 13, 2007, Simon filed a *pro se* petition for writ of habeas corpus in the Alameda County Superior Court. ECF No. 5-1, Ex. 1. On September 14, 2007, the

court denied the petition as untimely and for failure to state a prima facie case for relief. ECF No. 5-1, Ex. 2. On February 5, 2008, Simon filed a *pro se* petition in the California Court of Appeal, which was denied on March 19, 2008. ECF No. 5-1, Ex. 3. On July 23, 2008, he filed a *pro se* petition in the California Supreme Court, which was denied on January 14, 2009. ECF No. 5-1; Exs. 4, 5.

On November 29, 2009, Simon filed the instant habeas petition in this Court, raising three claims: (1) that he was incompetent at the time he pleaded no contest because he was "mentally retarded" and treated with psychotropic medications; (2) that his trial counsel was ineffective for failing to investigate his competency or request a competency hearing; (3) that his trial counsel was ineffective for failing to object to Simon being charged as an adult. Pet. at 1-15 (ECF No. 1). On January 28, 2010, this Court ordered Respondent to show cause as to why the petition should not be granted. ECF No. 4.

On March 23, 2010, Respondent filed a motion to dismiss the petition as untimely by over four years under 28 U.S.C. § 2244(d)(1)(A). ECF No. 5. Petitioner filed a *pro se* opposition arguing that the statute of limitations should be tolled to account for his mental impairment. ECF No. 6. He submitted a preliminary mental health report by Dr. Myla H. Young, Ph.D., dated August 14, 2006, raising the possibility that Simon was mentally impaired. Report of Dr. Young, Ex. B to Pet'r's Resp. to Mot. to Dismiss ("Young Report") (ECF No. 6-1, Ex. B). The Court found the report to be too ambiguous to justify equitable tolling and granted Respondent's motion to dismiss. ECF No. 10. Simon appealed and, on June 21, 2013, the Ninth Circuit issued a memorandum decision reversing and remanding on the issue of equitable tolling. *See Simon v. Uribe*, 528 Fed. Appx. 764 (9th Cir. 2013). The Ninth Circuit instructed this Court to "order any discovery, expansion of the record, or evidentiary hearing necessary to determine whether Simon is entitled to equitable tolling based on mental impairment." *Id.* at 765.

On remand, the Court appointed counsel for Petitioner. ECF No. 21. Instead of conducting an evidentiary hearing, the parties decided to request time to obtain Simon's prison records. Multiple continuances were granted to allow the parties sufficient time to

develop the record and file supplemental briefing. ECF Nos. 44-84. Experts were retained to evaluate Simon's cognitive functioning and provide opinions on whether Simon suffered from severe mental impairment such that it would be impossible for him to meet the filing deadline. Finding that the experts disagreed on the degree and impact of Simon's mental impairment, on October 17, 2016, the Court ordered an evidentiary hearing. The purpose of the hearing was to assess the experts' credibility, the bases of their conflicting opinions, and the relevance of disputed facts to the ultimate legal question. ECF No. 85.

A two-day evidentiary hearing was held on March 21 and 22, 2017. Petitioner's expert, Dr. Howard J. Friedman, Ph.D., testified on the first day, and Respondent's expert, Dr. Jessica Ferranti, M.D., testified on the second. ECF Nos. 94, 95. The parties filed timely post-hearing briefs addressing the effect of the testimony on Simon's equitable tolling claim. ECF Nos. 103, 104.

**LEGAL STANDARD**

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became law on April 24, 1996, imposed for the first time a statute of limitations on petitions for writ of habeas corpus filed by state prisoners. Ordinarily, a state prisoner must file his federal habeas petition within one year of the date his judgment became final, after the conclusion of direct review or after the time for seeking direct review has passed. 28 U.S.C. § 2241(d)(1). If he fails to do so, his petition would be subject to dismissal unless he can demonstrate that the limitations period was sufficiently tolled under statutory and/or equitable principles. *See Smith v. Duncan*, 927 F.3d 809, 814 (9th Cir. 2002).

A litigant seeking equitable tolling bears the burden of establishing that "he has been pursuing his rights diligently and […] that some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 645 (2010). The Ninth Circuit has held that a "habeas petitioner's mental incompetency… is, obviously, an extraordinary circumstance beyond the prisoner's control," sufficient to trigger equitable tolling. *Calderon v. U.S.*, 163 F.3d 530, 541 (9th Cir. 1998), *rev'd on other grounds by Woodford v. Garceau*, 538 U.S.

202 (2003). However, a showing of mental illness alone will not necessarily toll the limitations period because most mental illnesses are treatable, and with proper treatment many sufferers are capable of managing their own affairs. *See Miller v. Runyon*, 77 F.3d 189, 192 (7th Cir.), *cert. denied*, 519 U.S. 937 (1996).

To be eligible for equitable tolling due to mental impairment, a petitioner must meet a two-part test:

> (1) *First*, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control by demonstrating the impairment was so severe that either
>
> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>
> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>
> (2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

*Bills v. Clark*, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (internal citations and quotations omitted) (emphasis in the original).

The *Bills* test for mental impairment requires the Court to evaluate how a petitioner's mental impairment bore on his ability to file. "The relevant question is: Did the mental impairment cause an untimely filing?" *Bills,* 628 F.3d at 1100 n. 3 (quoting *Spitsyn v. Moore,* 345 F.3d 796, 799 (9th Cir. 2003)). The determination of whether it did is a case-specific, "highly fact-dependent" inquiry. *Id.* at 1097 (quoting *Mendoza v. Carey*, 449 F.3d 1065, 1068 (9th Cir. 2006)). Petitioner must show that his untimeliness was caused by his mental impairment and not by his own lack of diligence. *Bryant v. Ariz. Att'y Gen.*, 499 F.3d 1056, 1061 (9th Cir. 2007). The Ninth Circuit has stressed that the threshold necessary to trigger equitable tolling is very high, "lest the exceptions swallow the rule." *Miranda v. Castro*, 292 F.3d 1066 (9th Cir. 2002) (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000)). At the same time, "[r]ather than let procedural uncertainties unreasonably snuff out a constitutional claim, the issue of when grave difficulty merges literally into 'impossibility' should be resolved in [a petitioner's] favor." *Lott v. Mueller*, 304 F.3d 918, 920 (9th Cir. 2002).

**DISCUSSION**

Respondent seeks dismissal of Simon's petition on the ground that the petition is barred by the statute of limitations. ECF No. 5. The statute of limitations in Simon's case began to run on May 1, 2004, when the time for seeking direct review expired and his judgment became final. Absent statutory or equitable tolling, the one-year statute of limitations would have expired on May 2, 2005.[1] The parties agree that for purposes of ruling on Simon's claim of equitable tolling, the critical time period begins on the date limitations period commenced, May 1, 2004, and ends on November 29, 2009, the date Simon filed his federal habeas petition.[2] If Simon was sufficiently competent to file his federal habeas petition for a year or more during this period of four and a half years, then his petition must be dismissed as time barred.

The Ninth Circuit instructed district courts to proceed as follows when asked to evaluate whether a petitioner is entitled to equitable tolling:

> (1) find whether the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

*Bills*, 628 F.3d at 1100-01. In the present case, the Ninth Circuit found that Simon had made a non-frivolous showing that he suffers from a severe mental impairment, and remanded the case to this Court for a thorough development of the record. *See Simon v.*

---

[1]    Because May 1, 2005 fell on a Sunday, the limitations period continued to run until May 2, 2005. *See* Fed. R. Civ. P. 6(a)(1)(c).

[2]    The Court notes that Simon would have been eligible for statutory tolling for the period between the filing of his state habeas petition in superior court on September 13, 2007 and the date the California Supreme Court denied his state habeas petition on January 14, 2009, had the period until September 13, 2007 been equitably tolled and had his state habeas petitions not been dismissed as untimely. A state habeas petition is not "properly filed" for purposes of statutory tolling under 28 U.S.C. § 2244(d)(2) "if the state petition was determined by the state court to be untimely as a matter of state law." *Cross v. Sisto,* 676 F.3d 1172, 1176 (9th Cir.2012) (explaining that untimely state habeas corpus petitions do not toll AEDPA's statute of limitations).

*Uribe*, 528 Fed. Appx. 764, 765 (9th Cir. 2013). In the three years following remand, the parties developed the record in full, producing ample evidence for the Court to consider and evaluate. A brief summary of the relevant parts of the factual record follows.

## I.      Factual Record

### A.      Simon's Original Showing

In opposing Respondent's motion to dismiss, Simon submitted jail medical records from July 23, 2003 to March 17, 2004, and a preliminary neuropsychological evaluation prepared by Myla H. Young, Ph.D., on August 14, 2006. ECF No. 6, 24-26. The jail medical records note that Simon was prescribed Paxil and Trazodone on multiple occasions while he was held in juvenile detention. ECF No. 1 at 17-21. They do not specify a diagnosis but subsequent prison records suggest that Simon was diagnosed with depression in 2003.

Dr. Young was the first person to assess Simon's cognitive functioning. ECF No. 1 at 22-25. She conducted five neuropsychological tests, reported her results and provided a description of additional information that she thought necessary in order to ensure that the results of her tests were a valid representation of Simon's functioning. Her tests results were as follows: (1) Simon tested in the "expected range" on tests of malingering, indicating that he "was putting forth an appropriate level of effort on testing and that he was not attempting to 'fake' or 'malinger' the test performance";[3] and (2) Simon's intellectual functioning was in the "Extremely Low – 1st percentile (Formerly Mentally Retarded) range," equivalent to the intellectual functioning of a child "approximately 7 to 10 years old." *Id*. at 24. Dr. Young found that Simon's "reading recognition" was at the fifth grade level, and his spelling skills were at the third grade level. *Id*. She further noted

---

[3]      According to Respondent's expert witness, Dr. Ferranti, "malingering is the intentional production or exaggeration of symptoms for a secondary gain, such as being found incompetent to stand trial or being found criminally insane to avoid incarceration." Report of Dr. Ferranti, Ex. B to Pet'r's Supp. Brief ("Ferranti Report") at 29 (ECF No. 73, Ex. B).

that among seven measures of memory performance, on six tests his performance was "severely impaired" and on one test "moderately impaired." *Id.* His overall performance on all measures of executive functioning was "severely impaired." *Id.*

Dr. Young explained that "when a person scores as low on neuropsychological testing as [Simon] did, collateral interviews and official documentation are critical to understanding his functioning and assuring that test data is valid." *Id.* She recommended that a licensed psychologist "with knowledge of testing for mental retardation" complete interviews with family members and individuals outside the family such as teachers, coaches, and peers, so that the "possibility of mental retardation" can be conclusively assessed. *Id.*

### B.    Simon's Prison Medical Records from 2004 to 2015

The Court notes from the outset that, during the relevant time period, the institutions that Simon was housed in and the staff who treated Simon changed with great frequency. Simon was evaluated and treated for depression by mental health personnel, mostly nurses and interns; he was not evaluated by qualified prison personnel for intellectual or developmental disability. The prison medical records are relevant to the extent that they include descriptions from staff of Simon's words or actions at a particular time; they are not objective measurements of his actual intellectual functioning or the degree of his ability to adapt and function adequately within prison.

**2004**: After being sentenced in March 2004, Simon was transferred from Juvenile Hall to the custody of CDCR. He was screened for mental illness and placed in general population at the California Correctional Institution. Prison Records, Ex. A to Pet'r's Supp'l Brief, Bates Nos. 200-204.[4] An intern noted that he had "normal cognitive functioning" based on a passing score on a cognitive test; there is no indication of what

---

[4]    The Court refers to pages of the prison records by their bates-stamped numbers. Although the first 184 pages of Petitioner's records are stamped with a "PET" before the number, the Court does not use the "PET" identifier since only one set of prison records was lodged.

that the test entailed. Bates No. 201. On March 30, 2004, Simon reported feeling stressed and having trouble sleeping; he was diagnosed with "depression not otherwise specified" and given a Global Assessment of Functioning ("GAF") score of 60.[5] Bates Nos. 212-214. On the same day, the intern checked the available boxes on an evaluation form for cognition "within normal limits" but she handwrote that his judgment and insight were "poor." Bates No. 212. She also noted that diagnosis for DSM Axis II conditions was "deferred." *Id*. Developmental disability, or mental retardation as it was called at the time, is an Axis II condition. Bates No. 223. On July 8, 2004, Simon was transferred to the Harman G. Stark Youth Correctional Facility. He put in several sick call requests, seeking help for sore throat, though subsequent records show that "a cellie had to fill out the inmate requests for him" because Simon is barely able to read and write. Bates Nos. 248-51, 103. On December 28, 2004, upon transfer to the California Institution for Men, Simon was asked to fill out a mental health screening form. Bates Nos. 287-288. He drew lines through the form instead of filling out the appropriate bubbles, in contravention of the instructions. He also failed to complete the part of the interview that required more than "yes" or "no" answers. Bates Nos. 289-290. He was once again placed in general population. Bates No. 291.

**2005-2006**: Simon did not take medication for depression during this time because he reported feeling "straight." Bates No. 229. He was not seen by mental health staff until October 2011. *See* Ferranti Report at 14. The only documents in his prison records are requests for medical care and intake forms completed when he was transferred from one institution to another. On April 12, 2005, he submitted a medical care request because he

---

[5] A GAF score is a subjective estimate of an inmate's overall psychological, social and occupational functioning "that is used to plan treatment and measure the impact of treatment." *Vaughn v. Diaz*, 2014 US Dist. Lexis 140449, at *10-11 n. 4 (E.D. Cal. 2014). A score of 60 indicates moderate psychological symptoms, such as flat effect or occasional panic attacks, or moderate difficulty in social, occupation and school activities. *See Stone v. Knipp*, 2011 WL 5526417, at *6 (E.D. Cal. Nov. 14, 2011). Because Simon was being treated for depression, the Court finds it likely that the GAF score he was initially assigned, as well as his follow-up scores, relate to his depression and the impact of treatment on his depression, not to his intellectual functioning.

was suffering from itchy skin. Bates No. 307. On June 20, 2005, Simon was transferred to San Quentin and then on October 24, 2006, he was transferred to High Desert State Prison. Bates Nos. 330, 335.

**2007-2008**: In January, 2007, Simon complained of pain in his ear. Bates No. 345. On March 22, 2007, a clinician noted that Simon reported "non-receipt of medication" when the medication was in the clinic and Simon had failed to picked it up. Bates No. 360. On May 31, 2007, a progress note written by a doctor indicated that Simon was confused about when he needed to return to the clinic so that the drainage tube that was placed in his ear could be checked. Bates No. 379. On February 26, 2008, Simon complained that the tube had been in his ear for over one year when, in fact, the tube had been in for about nine months. Bates Nos. 397, 379.

**2009-2010**:[6] On March 3, 2009, Simon was transferred to Centinela State Prison. Bates No. 459. On August 18, 2010, Simon gave consent for dental treatment but according to a follow-up progress note, he did not understand what treatment he received. Bates No. 554. On October 8, 2010, Simon took the Test of Adult Basic Education ("TABE") for the first time and scored 6.6.[7] On November 19, 2010, Simon claimed that the tube in his ear had been placed "a year ago" when, in reality, the tube had been placed three years prior. Bates No. 536.

**2011**: In May 2011, Simon was transferred to California State Prison Solano. Bates No. 567. On October 6, 2011, Simon was given a mental health evaluation due to his depression and difficulty sleeping. The clinician did not check the boxes for cognition "within normal limits" but instead wrote, "I/M [Inmate/Male] may have lower cognitive functioning ability. Needs clarification and review of [Central] file." Bates No. 590. The

---

[6] As discussed above, the period for which Simon claims equitable tolling ends on November 29, 2009 with the filing of the present petition in federal court. Since Simon claims that he has a stable and lifelong developmental disability, the Court finds Simon's prison records after 2009 relevant to the assessment of the severity of his disability.

[7] TABE scores "reflect an inmate's educational achievement level and are expressed in numbers reflecting grade level.'" *Alexander v. Uribe*, 2012 WL 2872809, at *6 n. 3 (E.D. Cal. 2012) (citations omitted). Individuals who score under 4.0 are automatically classified as disabled.

clinician wrote "poor" by the fields for insight and judgment and did not check "within normal limits." *Id.* She further wrote "poor historian/exhibits poor recall." Bates No. 594. She checked "within normal limits" for thought processes, perception and thought content, but the conditions listed under those categories suggest that "perception" refers to "hallucinations," and "thought content" to "delusions, obsessions and magical thinking." Bates No. 590. Finally, the clinician noted that she used communications technI.Q.ues to speak with Simon, such as speaking slowly, rephrasing questions, using simple English, and verifying often that Simon understood. Bates No. 595. Two weeks later, on October 20, 2011, computer-generated X's appeared in the boxes for cognition and insight/judgment "within normal limits", the same boxes the clinician had refused to manually check earlier. However, the form noted that DSM Axis II diagnosis was deferred. A progress note stated that "I/M is oriented x3 but continues to present in a guarded, almost confused state." Bates No. 625. In December 2011, after being transferred to Deuel Vocational Institution, Simon was evaluated by an interdisciplinary treatment team. A clinician noted that he needed to consider "EC [effective communication] needs of the patient," speak slowly and use simple English. Bates No. 656.

**2012**: On February 3, 2012, Simon reported that he had run out of Paxil. The clinician noted that he "spoke slowly and used simple English." Bates No. 669. He also said that Simon "appears to have some difficulty with comprehension" and rephrasing was needed. *Id.* He pointed out that according to Simon, "his cellie had to full out the inmate request for him." *Id.* On February 7, 2012, Simon met with Dr. Katz and talked about his history. Simon reported that even though he had been to three different educational programs, he could not learn to read and write. Bates Nos. 673-74. Simon agreed to write long-term goals but later said that "he did not know how to go about it." Bates Nos. 682-683. When Dr. Katz pointed out that Simon had a TABE score of 6.6, which would indicate that he has "some reading skills," Simon responded that he thought the test score was wrong. Bates No. 692. On August 23, 2012, Simon reported that he had received some paperwork "regarding his appeals work" and "feels rather frustrated because he has

difficulties working on these things on his own. He noted that in the past he had inmates who were very helpful to him and, at the moment, he has a couple of people that he can go to for support but he is not sure if he is doing things right." Bates No. 756. On December 3, 2012, Simon explained that he does not take his anti-depressants when he feels well, even though he had been told multiple times that regular compliance was needed for the medications to work. Bates Nos. 792-793. Simon met with Dr. Katz multiple times in 2012; each time Dr. Katz noted that he spoke slowly, used simple English, and repeated himself often. Bates Nos. 682-683; 692-693; 713-714; 719.

**2013**: In January, Simon was assigned a job working in the kitchen. By April, he received a counseling chrono for failing to consistently show up for work. Bates Nos. 49-50. Simon told Dr. Katz that he had received "some kind of weird write-up" and was not able to tell whether he had received a 128 counseling chrono or a 115 chrono. *Id*. Dr. Katz clarified that it was a 128 chrono and instructed Simon to "put in a form 22 to the lieutenant." *Id*. On April 8, 2017, Simon said he "had been working with his boss on the issue and thought that they had an understanding, but now has a write-up." Bates No. 826-829. On May 2, 2013, Simon was once again under the mistaken impression that he had received a form 115 chrono. He asked Dr. Katz to help him fill out paperwork he had received from his counselor in order to apply for restoration of custody credits. Dr. Katz "spent some time reviewing and reading the notes to him" and Simon decided to "go ahead and sign the sections that his counselor wanted signed." Bates Nos. 834-835. On June 19, 2013, a clinician filled out a mental health evaluation form noting that Simon's insight and judgment were "limited," right below the computer-generated X's placed in the "within normal limits" boxes for cognition. Bates No. 866. On October 3, 2013, the clinician reported Simon's "repeated poor med compliance." Bates Nos. 913-914. Simon continued to question why he needed to take his medications on a regular basis even though multiple clinicians had explained to him the need for compliance. On December 18, 2013, a progress note for the first time listed Simon's TABE score as a "disability code" of ≤ 4.0. Bates No. 918.

**2014**: Records reflect that Simon retook the TABE test on January 24, 2014 and scored 0.7.[8] Bates Nos. 922-923. Further, 2014 records continue to list Simon's old and debunked score of 6.6. Bates Nos. 928, 931, 966, 1168-70. On March 27, 2014, the clinician recommended that Simon "get back to working on his GED (including to learn to read and write.)" Bates Nos. 930-931. On May 7, 2014, Simon was transferred to California Medical Facility and the initial screening form listed "TABE 0.7" under "Disability code." Bates No. 952. On September 3, 2014, a progress report noted Simon's "slowed thought processes" on the first page, but on the second page, it stated "thought processes within normal limits." Bates Nos. 988-89.

**2015**: In January 2015, Simon received a write-up for possession of a contraband cellphone. He was admitted to a mental health crisis facility for a short stay. Bates Nos. 1011-1012. The clinician in the facility noted that he "appeared manipulative and antisocial" but also that he has "poor insight into how he can make positive changes in his life." Bates No. 1055. On April 20, 2015, during a suicide risk evaluation, the clinician described Simon's demeanor as follows: "[patient] appeared internally preoccupied, speech kept to minimal, long pauses observed before his responses, a few times asked 'what does it mean… I don't know.'" Bates No. 1128. In 2015, clinicians consistently made accommodations by speaking slowly and giving Simon additional time for comprehension. Bates Nos. 1061, 1067, 1072, 1120.

### C.     Petitioner's Education Records

Records show that when Simon was in first grade, he was referred for educational screening to ascertain whether he was "experiencing difficulties in his attempt to learn to read."[9] Bates No. 1137-1144. It was noted that he was not making adequate progress in

---

[8]     The Court notes that Simon's score was listed as below 4.0 in progress notes starting December 18, 2013 even though he did retake the TABE test and score below 4.0 until January 14, 2014. Bates No. 918. One or more of the dates appear to be in error. Inconsistencies and inaccuracies are, in fact, present throughout Simon's prison records.
[9]     Dr. Friedman testified that Simon was likely never screened by a clinical psychologist for intellectual disability because school districts were precluded from

reading and was "far below the level of most students," even though he was older than most of the children in his class. *Id.* There are no records showing that Simon was placed in special education classes although his family members report that he was. In ninth grade, Simon received all D's and F's. Bates No. 1147. While in juvenile hall, he was placed in eleven and twelve grade classes, where, according to his transcript, he received A's, B's and one C. Bates No. 1596.

### D.    Definition of Intellectual Disability

The Court finds it necessary to define a few key terms before summarizing the reports and testimonies of the parties' expert witnesses. The experts agreed that the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), sets forth the definition and criteria for a diagnosis of intellectual disability. *See* Am. Psychiatric Ass'n, Diagnostic and Statistics Manual of Mental Disorders (5th ed. 2013). According to the manual, "intellectual disability" (also referred to as "intellectual developmental disorder") is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. DSM-5 at 33. Prior to 2010, the term "mental retardation" was used in place of "intellectual disability." *See* Rosa's Law, Pub. L. 111-256 (formally changing terminology).

There are three components of an intellectual disability diagnosis: (A) deficits in intellectual functioning, such as reasoning, problem-solving, planning, abstract thinking, judgment, academic learning, learning from experience, and practical understanding, confirmed by both clinical assessment and comprehensive intelligence testing; (B) deficits in adaptive functioning, which without ongoing support limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, and across multiple environments, such as home, school, work and recreation; and (C) the

conducting intellectual testing on African American children. Friedman Report at 9.

onset of intellectual and adaptive deficits during the developmental period. DSM-5 at 33.

Deficits in intellectual functioning are typically measured by tests of intelligence. Individuals with intellectual disability have composite I.Q. scores of 65-75 or below.[10] *Id*. at 37. Deficits in adaptive functioning refer to how well a person meets community standards of personal independence and social responsibility, and are assessed through clinical evaluation. *Id*. The degree of an individual's intellectual disability can be mild, moderate, severe, and profound. *Id*. at 33. Levels of severity are defined on the basis of adaptive functioning, and not I.Q. scores, because it is adaptive functioning that determines the level of supports required. *Id*.

### E.    Dr. Friedman's Expert Report

Dr. Howard Friedman, who holds a Ph.D. in neuropsychology, was retained by Petitioner's counsel to conduct a thorough neuropsychological evaluation of Simon. Dr. Friedman has received clinical training in mental disorders with an emphasis on intellectual disabilities. *See* Friedman CV, Resp't's Ex. 13 to Evid. Hr'g. He has extensive training and experience in performing tests of intellectual and cognitive abilities in domains such as memory, concept formation, multitasking and processing speed. 1 RT 9-18.[11] In preparation for Simon's evaluation, Dr. Friedman received background information on Simon, as well as Dr. Young's preliminary report. Friedman Report at 1. He did not receive Simon's prison medical records or educational records, as those were not available at the time of his evaluation.

Dr. Friedman was asked to determine whether or not Simon "was precluded from

---

[10]    Tests of intellectual functioning are scored on a standard bell curve. A standard core of 90-109 is the average score within an age-specific population. A score above 110-119 is high average, 120-129 superior, and above 130 very superior. A score of 80-89 is considered low average, a score of 70-79 borderline, and a score below 70 extremely low. *See* Pet'r's Ex. A to Evid. Hr'g; 1 RT 19-21.

[11]    The Court uses the following citation format when citing to the transcript of the evidentiary hearing: the number preceding RT represents the volume number, while the number following RT represents the page number of the transcript. Volume 1 documents the first day of the hearing, during which Dr. Friedman testified. Volume 2 documents the second day of the hearing, during which Dr. Ferranti testified.

filing his [habeas] petition by reason of mental impairment" between 2004 and 2009. *Id*. at 1. To render his expert opinion, Dr. Friedman conducted a number of assessments that fall into two categories: (a) over a dozen neuropsychological tests that directly measure Simon's intellectual functioning; (b) interviews of Simon and his family members that provide the basis of a clinical assessment of Simon's adaptive functioning. *Id*. at 3-8.

Dr. Friedman began by conducting a four-hour evaluation of Simon. He began by asking Simon questions about his then-present circumstances. Simon explained that he thought he had been transferred to a high security facility because he got points for not going to his job that "he did not know he had." *Id*. at 2. When asked when he was convicted, Simon did not understand the word and said, "when I came to jail?" *Id*. When asked what he was convicted of, he responded, "What I was going to court for?" *Id*. When asked if he had ever gone to special education classes, he said that, "he did go to some portable rooms behind the school but [...] did not know what they were for." *Id*. at 3. He also reported that he had attended some educational programs in prison but did not finish them because he needed a job in order to be able to call his family. *Id*.

During the four-hour evaluation, Dr. Friedman measured Simon's intellectual functioning by administering thirteen tests. *Id*. at 2. Based on the scores of three tests that screen for malingering, Dr. Friedman concluded that Simon was not malingering or feigning symptoms. *Id*. at 5. Next, Dr. Friedman used the Wechsler Abbreviated Intelligence Scale, Fourth Edition ("WAIS-IV") to test Simon's intellectual functioning across a series of domains. Within the verbal comprehension domain, Simon had a standard score of 68, described as "extremely low" and within the second percentile of the adult population. *Id*. at 6. His processing speed score was 62, described as "extremely low" and within the first percentile. *Id*. His perceptual reasoning score was 84 and his working memory score was 80, both described as "low average" and within the fourteenth and ninth percentile respectively. *Id*. Dr. Friedman used a separate test, called the Naming Test, to assess Simon's language functioning. Simon's reading score was 60 and his sentence comprehension score was 55, both described as extremely low. *Id*. at 7. His level of

15

reading in identifying words and extracting information from sentences was severely impaired, in the first percentile compared to the adult population, and equivalent to somebody in the second grade. *Id*. Dr. Friedman also found that Simon was "impaired with multitasking and alternating between different tracks of information." *Id*. at 9. His full scale I.Q. was 70, which falls within the "borderline" range between "low average" and "extremely low". *Id*. at 8. Simon's overall intellectual functioning is in the second percentile, indicating that ninety-eight percent of the adult population exhibits higher intellectual functioning than him. Based on these tests, Dr. Friedman concluded that Simon's intellectual ability is in the moderately to severely impaired range. 1 RT 97-98. Since Simon tested consistently across two evaluations, Dr. Friedman's in 2015 and Dr. Young's in 2006, Dr. Friedman determined that Simon's low functioning was representative of his long-term functioning "to reasonable neuropsychological probability." *Id*. at 9.

To assess Simon's adaptive functioning, Dr. Friedman interviewed three of Simon's family members: his aunt and two cousins, all of whom had resided with Simon prior to his incarceration. *Id*. at 3-4. Dr. Friedman used the Adaptive Behavior Assessment System-3 ("ABAS-3") to evaluate and score their answers and behavior. Simon's family members stated that, as a child, Simon struggled with a number of age appropriate activities: Simon "could not figure out how to put [money] in the [money receptacle] on the bus", "could not tie his own shoes", was "unable to know when he should be inside or outside, such as when playing," had "a difficult time understanding whatever was said to him" and when comments were "repeated over and over again and explained in detail in order for him to grasp," he "was never able to get multiple step instructions." *Id*. at 3. When he did try to follow instructions and was unsuccessful, he "would freeze and cry," would have to be helped, and "[e]ven then he could still not do it independently." *Id*. While he was able to handle "self-care and hygiene," he "always needed reminders." *Id*. at 4. He was placed in special education classes and was able to improve his performance over the years, but still needed his cousin to help him with homework. When his cousin would explain school

material to him, Simon "mostly" did not understand it and "would get tired and start crying." *Id*. The school "wanted him to see psychiatrists" and at least once gave him prescription medications, which his grandmother did not let him take "based on her beliefs." *Id*. His family said that Simon did not display facial or emotional expression "even when watching cartoons." *Id*. at 3. They called him "a follower" who gravitated toward "bad guys" in the neighborhood. *Id*. at 4. He would do as other kids say "maybe to fit in and not feel different." *Id*. Lastly, Simon's relatives noted that when they visited him in prison after being out of touch for six years, "he seemed more grown up" and able to "hold a conversation." *Id*. They also stated that a number of people were helping him in prison "as sort of jailhouse lawyers." *Id*. Based on information received from family members and the ABAS-3 assessment tool, Dr. Friedman determined that Simon's adaptive functioning was moderately impaired.

On February 21, 2016, Dr. Friedman completed an expert report summarizing his findings and conclusions. He determined that Simon's intellectual functioning "was in a reasonable probability range consistent with Mental Retardation/Intellectual Disability, and his level of adaptive functioning was also at that level." *Id*. at 10. He concluded Simon "displays a Developmental Disorder which has a lifelong impact on his functioning." *Id*. In his opinion, Simon's ability to "have understood and managed paperwork independently [during the tolling period] would have been impaired." *Id*. Simon would "certainly not have been able to track information with reasonable accuracy and consistency. He would not have been able to learn and remember specific details, such as filing dates." *Id*. at 10.

### F.     Dr. Ferranti's Expert Report

Dr. Jessica Ferranti, who holds an M.D. in psychiatry, was retained by Respondent's counsel to perform a mental evaluation of Simon. As a psychiatrist, Dr. Ferranti has completed general medical training and a two-year residency in mental health. *See* Ferranti CV, Resp't's Ex. 17 to Evid. Hr'g. As part of her mental health training, she has studied intellectual disabilities but has not been trained in conducting

17

neuropsychological testing. 2 RT 1-10. In addition to general psychiatry, she is certified in forensic psychiatry and has experience consulting in both civil and criminal litigation.

Dr. Ferranti was asked to provide an opinion "regarding whether Simon was incompetent to file a timely petition for a writ of habeas corpus due to functional impairment(s) of a mental disorder, disease or defect." Ferranti Report at 1. In connection with her evaluation, she reviewed Dr. Friedman's report, Simon's pro se filings, and all 1600 pages of Simon's prison medical records.

On April 15, 2016, Dr. Ferranti conducted a three-hour forensic psychiatric evaluation of Simon. She asked him questions about his educational, legal and substance abuse history. Some relevant facts not already stated include the fact that Simon reported using drugs and alcohol at a young age. *Id*. at 3. He said he started using marijuana and alcohol at age eight and street drugs, such as crack and ecstasy, at age thirteen. He said that he drank alcohol daily between ages thirteen to fifteen and snorted cocaine "a lot" because both were easily available in the neighborhood he grew up in. *Id*. at 5. When asked about his legal history, he said he went to juvenile hall once for "drugs, crack." *Id*. at 3. When asked about the time he was charged with attempted murder and robbery at the age of fifteen, he said, "I had never been nowhere near CYA [California Youth Authority] or anything, none of that stuff…" *Id*. at 4. Simon told Dr. Ferranti his lawyer advised him to take "a deal" and that he felt under pressure by both his mother and his aunt to follow the lawyer's advice. *Id*.

Dr. Ferranti noted that during the interview, Simon's demeanor was "calm and cooperative." *Id*. at 6. She also pointed out that he seemed able to relate circumstances relevant to the filing of his habeas petition: in Dr. Ferranti's words, Simon explained that "his attorney did not advise him that an appeal was possible so he was uninformed about the process until he was later able to seek legal help from his peers in prison." *Id*. at 7. Dr. Ferranti concluded Simon demonstrated the ability to advocate for himself.

Dr. Ferranti administered two tests to assess Simon's intellectual functioning. On the Folstein Mini-Mental Status Examination, a score of 30 indicates no gross abnormality

18

United States District Court
Northern District of California

is apparent; Simon scored 27. *Id.* at 7. On the Montreal Cognitive Assessment, which screens for mild cognitive dysfunction, a score of 26 or above is considered normal. Simon scored 22. *Id.* at 8. Dr. Ferranti administered four tests to screen for malingering; on three of them, Simon's score did not suggest he was malingering or feigning symptoms, on one of them his score was at the cutoff point. *Id.* at 8-9. Dr. Ferranti chose not to diagnose malingering.

Dr. Ferranti based her assessment of Simon's adaptive functioning on her review of Simon's prison medical records. Other than parts of the record already summarized above, Dr. Ferranti noted that Simon did not receive mental health care services between April 2004 and October 2011, that he was "mostly illiterate" in that his reading and writing skills were poor, and that he had a history of being diagnosed with depression. *Id.* at 14. In considering the level of his adaptive functioning, she stressed that he had been housed in general population throughout his incarceration and that he has been able to seek help from other inmates with writing medical requests and filling out forms. She found the family's report of profound daily living impairment inconsistent with his level of independent functioning in prison. On that basis, she concluded that "while it is possible Mr. Simon meets criteria for borderline intellectual functioning (I.Q. 70-84), Simon's pattern of adaptive functioning in CDCR does not support the substantive impairment in activities of daily living one would expect in mild intellectual disability." *Id.* at 27.

In conclusion, Dr. Ferranti acknowledged Simon's deficits in intellectual functioning on the tests she administered, as well as his lack of abstraction skills, but refused to diagnose him with intellectual disability.[12] *Id.* at 27. She stated she needed additional information before being able to make such a diagnosis. In her opinion, there was "no substantial evidence Mr. Simon was suffering from a major mental disorder, disease or defect, that caused him to be substantially functionally impaired during the time

---

[12] Dr. Ferranti did diagnose Simon with a number of mental health illnesses not directly related to intellectual disability: alcohol use disorder, cocaine use disorder, cannabis use disorder, antisocial personality disorder, and other specified depressive disorder. Ferranti Report at 23-26.

period of 4/30/2004 to 4/30/2005." *Id*. at 32. She additionally concluded that, "even if Mr. Simon was provided a diagnosis of Borderline Intellectual Functioning, then it would still be [her] opinion that he was competent to file the habeas petition during the relevant time period." *Id*. at 29.

## E. Evidentiary Hearing Testimony

Dr. Friedman and Dr. Ferranti testified at the evidentiary hearing held on March 21 and 22, 2017. The hearing gave the experts a chance to respond to each other's reports and explicate their differences in opinion. In the summary of evidentiary hearing testimony that follows, the Court will not include parts of the experts' testimony which simply repeated findings listed in their reports and already summarized in this order.

Dr. Friedman and Dr. Ferranti agreed that Simon has a composite I.Q. score of 70 and thus suffers from impairment in intellectual functioning, but they disagreed as to degree of that impairment. Dr. Friedman focused on the four domain scores that make up a Full Scale I.Q. score. Simon's scores within the verbal comprehension (68) and processing speed (62) domains were in the extremely low range, while his scores in the other two domains, perceptual reasoning (84) and working memory (80), were in the low average range. Considering these scores along with the scores on attentional processing, memory functioning, and concept formation tests, Dr. Friedman concluded that Simon's overall intellectual functioning is in the extremely low range. 1 RT 98. Dr. Ferranti disagreed with Dr. Friedman's approach of utilizing the subclass scores; she insisted that the Full Scale I.Q. is a better measure of a person's functioning because "our brains don't function as one subscale" and people compensate for weaknesses in one area with strengths in another. 2 RT 173-174. She also claimed that her and Dr. Friedman had "an essential disagreement about what sorts of important deficits come along with that I.Q." of 70. 2 RT 178. Dr. Ferranti testified that a person with an I.Q. of 70 could be "a bagger in a grocery store." 2 RT 186. Dr. Friedman explained that just because an intellectually impaired person is educable and can learn to pack bags, for example, does not mean that they are not impaired

across domains that would prevent them from completing a complex task, such as filing a habeas petition. [13] 1 RT 101-102.

The experts also took divergent approaches to assessing Simon's adaptive functioning. As stated above, adaptive functioning refers to an individual's functioning in areas of daily life, such as communication, social participation and independent living. DSM-5 at 37. Dr. Friedman based his assessment of Simon's adaptive functioning on interviews with Simon's family members; Dr. Ferranti based hers on a review of Simon's prison records. Dr. Friedman testified that his approach comports more closely with diagnostic instructions from the DSM-5: "adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained." DSM-5 at 38; 1 RT 105. He explained that he would not have been able to assess Simon's actual adaptive functioning based on his behavior in prison because prison is a strictly controlled environment that gives Simon little choice in how he manages his life and significant support in getting his basic food, work and recreation needs met. 1 RT 105-107, 116 (stating that it would be impossible to isolate Simon's actual adaptive abilities from the supportive environment). Because Simon has been incarcerated since he was 15, the last time he functioned outside a controlled environment was when he lived with his family members as a teenager. Family members are "typically who you get information from," Dr. Friedman testified; "you interview the people who live[d] with the individual and observed his behavior." 1 RT 60. Based on the family's reports of Simon's abilities, Dr. Friedman concluded that his adaptive functioning was impaired.

Dr. Ferranti did not rely on family information to render her assessment on Simon's adaptive functioning because she thought that family information was inherently

---

[13]     He also opined that when a clinician focuses on the full scale I.Q. score, he loses the detail within the contributing scores. While the full scale I.Q. is helpful for some purposes, "it doesn't necessarily reflect the difficulties seen in some of the component portions of it." 1 RT 35. Because Simon was low functioning on some parts of the tests that Dr. Friedman administered, the testing "moved quickly." 1 RT 17. Dr. Friedman intended to meet with Simon for six hours but was able to administer the tests in four hours.

unreliable. She testified that family members generally have motivations "to feign or exaggerate or even make up entirely mental-health symptoms." 2 RT 159-161. When asked if he considered that possibility, Dr. Friedman confirmed that he did. He testified that he tracked carefully their responses and demeanor, noticing that they were selective in what problems they reported. 1 RT 61. According to Dr. Friedman, "that degree of selectivity would suggest… that they were being honest in their appraisal of what [Simon] could or could not do." 1 RT 61, 119. He found no inconsistencies in their interviews. *Id*. Dr. Ferranti questioned whether the impairment in basic adaptive skills Simon exhibited as a child was a product of his intellectual disability or a result of his drug and alcohol use. 2 RT 183. When asked about Simon's failing grades prior to incarceration (D's and F's) and his improved grades in juvenile hall (A's and B's), Dr. Ferranti thought that the change could have been a product of Simon's sobriety once in juvenile hall. By contrast, Dr. Friedman testified that "there is no possible way" the grades listed in Simon's transcript from juvenile hall could have been achieved by him unless "they were assigned to him [just] for showing up." 1 RT 70.

Dr. Ferranti claimed Simon did not exhibit deficits in adaptive functioning. She admitted that prison records have limitations and that DSM-5 cautions against making an adaptive functioning assessment within prison, and yet she thought that prison records provided the most accurate information of Simon's actual functioning in prison. 2 RT 227. In her opinion, someone with the level of functioning described in the prison records could not be suffering from an intellectual disability. Dr. Friedman vigorously disagreed. In his opinion, improved functioning in a controlled environment does not obviate the existence of intellectual disability. According to Dr. Friedman, while intellectual functioning remains stable over time, adaptive functioning improves as a person progresses into adulthood, especially if provided a controlled supportive environment. 1 RT 106 ("the expectation would be that [Simon] would have improved and not have the level of impairment that he would have shown in childhood."); 1 RT 77 ("Treatment for those with intellectual disability includes placement in a structure environment. Structure

22

compensates for […] early functional impairments.") Consequently, seeing excerpts from medical records or petitions filed on Simon's behalf did not change Dr. Friedman's diagnosis. 1 RT 22-23. Based on intellectual functioning in the moderately to severely impaired range, and adaptive functioning that was moderately impaired, Dr. Friedman diagnosed Simon with mild intellectual disability. 1 RT 50-51.

Lastly, the experts disagreed on whether Simon was capable of understanding the need to file a habeas petition within the limitations period. Dr. Ferranti testified that Simon was capable of understanding a concept like a filing deadline. 2 RT 184. She claimed that "people with I.Q. like Simon's would be able to know basic things like that, like a child can know that they go to school at 8:00 am." 2 RT 185. When asked if filing a petition on time requires multitasking, she admitted that it does and stressed that "we are talking about degrees." *Id*. When reviewing the *pro se* filings in Simon's case, she noted that "either he or he with assistance" was able to made those filings. 2 RT 210. If he had the capacity to timely file in 2008, Dr. Ferranti said, "then he had it in 2004." 2 RT 208. Dr. Friedman relied on his more detailed assessments of Simon's intellectual functioning to arrive at the contrary conclusion. In his opinion, Simon did not have the intellectual ability to personally understand the need to file a timely petition. First, Simon would not have been able to understand that there might be legal issues with his case or know how to articulate them. Second, he would not have been able to keep in mind multiple tracks of information: doing paperwork is one task, "a deadline regarding the paperwork is a whole another element and requires multitasking" 1 RT 47. Because Simon's ability to multitask is "severely impaired, at an elementary level," he would not have been able to keep track of the deadline in conjunction with what he needed to do for the deadline. [14] 1 RT 46. Third,

---

[14]     To measure Simon's multitasking capacity, Dr. Friedman employed the second portion of the Trail Making Test. Friedman Report at 7; 1 RT 45-46. The test taker is required to sequence numbers or alternately numbers and letters, essentially keeping two tracks of information in mind. "The expectation is that people finish within 40-50 seconds with no errors. Simon finished in 301 seconds and had three errors. An error is considered pathognomonic or indicative of brain function." 1 RT 46. His speed placed him in the "severely impaired range (standard score 51, less than first percentile)." *Id*.

Simon would not have been able to remember the deadline and the information related to it because his memory functioning was severely impaired. Friedman Report at 7; 1 RT 56. And fourth, according to Dr. Friedman, Simon's ability to learn information, store it away, and reproduce it at a later time is impaired. 1 RT 65. Simon is very slow at simple tasks; adding complexity and the need for layered comprehension of legal material would exacerbate his impairment. 1 RT 79-82. Dr. Friedman testified that for all of these reasons, Simon would not have been able to understand the need to timely file at any point of the equitable tolling period.

## II.   Analysis

### A.   Simon Has Satisfied His Burden of Showing Mental Impairment.

Per the Ninth Circuit's instructions in *Bills*, the Court must now assess whether "the petitioner satisfied his burden that he was in fact mentally impaired." *Bills*, 628 F.3d at 1100. The Court is presented with the difficult task of making this legal determination based on divergent clinical diagnoses. After careful consideration of the record, the evidentiary hearing testimony, and the intellectual disability criteria listed in the DSM-5, the Court finds that Simon has met his burden of showing that he has an intellectual disability and is thus mentally impaired.

The experts' different approaches and areas of expertise have allowed the Court develop a more complete picture of Simon's abilities, limits and disabilities. It is sufficiently clear from the record at hand that Simon meets the three criteria for a diagnosis of mild intellectual disability outlined in the DSM-5. He exhibits deficits in intellectual functioning and deficits in everyday adaptive functioning, both of which developed during his childhood in the so-called developmental period. DSM-5 at 37.

The Court finds Dr. Friedman's evaluation of Simon's intellectual functioning to be more comprehensive, more careful and better aligned with the instructions of the diagnostic manual. Dr. Friedman, a neuropsychologist, had the training and expertise necessary to administer over a dozen "psychometrically sound tests of intelligence," as

required by the DSM-5. DSM-5 at 37. His intelligence tests were significantly more numerous and thorough than Dr. Ferranti's. *Compare* Friedman Report at 4-6 (administering thirteen tests), *with* Ferranti Report at 6-7 (administering two tests). Especially significant here is the fact that Dr. Friedman could *directly test* aspects of mental functioning key to an individual's ability to file a legal document on time. By comparison, Dr. Ferranti often found herself *hypothesizing* what Simon could and could not do based on what other individuals with an I.Q. of 70 could do. *See, e.g.*, 2 RT 186 (Dr. Ferranti testifying that "a person with an I.Q. of 70 […] could maybe be a bagger in a grocery store"). DSM-5 specifically cautions against using a single I.Q. score to infer how an individual would function in particular cognitive areas: "Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual disabilities than a single I.Q. scores [because] such scores may identify areas of relative strengths and weaknesses." DSM-5 at 37.

Simon's scores on individual cognitive profiles revealed areas of impairment relevant to the issue of equitable tolling. Simon was particularly impaired in areas of verbal comprehension, processing speed, word reading, and understanding of complex ideational material. 1 RT 20-56. He was less impaired, though still impaired, in areas of perceptual reasoning, working memory, and concept formation. His overall I.Q. score of 70 fell in between the "borderline" and "extremely low" categories below the population mean. Even Dr. Ferranti's simpler and more generalized tests showed that Simon was impaired in abstract reasoning and executive functioning. Ferranti Report at 6-7; 2 RT 175; 1 RT 73 (Dr. Friedman testifying Dr. Ferranti's tests are used for dementia); 2 RT 200 (Dr. Ferranti admitting her testing instruments were more basic). Finding the method of Dr. Friedman's analysis to be reliable and consistent with the requirements of the DSM-5, the Court adopts Dr. Friedman's conclusion that Simon's intellectual functioning falls within the moderately to severely impaired range.

The Court adopts aspects of both Dr. Friedman's and Dr. Ferranti's analyses to assess Simon's impairment in adaptive functioning. Adaptive functioning, as defined in the

25

DSM-5, refers to "how well a person meets community standards of personal independence and social responsibility." DSM-5 at 37. The fact that Simon is incarcerated makes it impossible to determine how well he would meet these standards when functioning as a free man in society. For this reason, the DSM-5 explicitly warns that adaptive functioning "may be difficult to assess in a controlled setting (e.g., prisons, detention centers)". *Id.* at 28. Clinicians are advised to collect information about adaptive functioning outside such controlled settings. Dr. Friedman's interviews with Simon's family members appear not just appropriate but necessary under the circumstances. The Court takes into account Dr. Ferranti's warning that family members have a motive to fabricate or exaggerate symptoms of disability, but finds convincing Dr. Friedman's clinical assessment that they were selective and earnest in their appraisal of Simon's abilities. Their descriptions of Simon's behavior as a child appear consistent with Simon's level of intellectual functioning, which both experts agreed remains stable over a lifetime. The fact that Simon began using drugs and alcohol at an early age may have compounded the impairment his family observed, though as Dr. Friedman explained, it is doubtful that substance abuse could have caused the level of impairment Simon suffers from, or that the substance abuse would have remained undetected. 1 RT 121-122. A ten-year-old child that is not intellectually disabled would likely be able learn to tie his own shoes and pay for the bus, even if he was using drugs or alcohol.

The experts agreed that Simon's adaptive functioning appears to have improved from childhood to adulthood. In Dr. Ferranti's opinion, his relatively higher functioning as an adult is a sign that he does not have an intellectual disability, despite the low scores on her own tests of intellectual functioning. In Dr. Friedman's opinion, some degree of improvement was to be expected, especially given that for the last ten years, Simon has been held in a controlled setting characterized by rigid routines and simple tasks. The Court finds the following advisement in the DSM-5 key to this analysis: "Diagnostic assessments must determine whether improved adaptive skills are the result of stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may

26

United States District Court
Northern District of California

no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate)." DSM-5 at 39. The prison medical records show that Simon is able to perform certain tasks on his own and control his behavior enough to remain housed in general population, but they also show that he continues to need support and ongoing interventions to get his basic needs met. *See, e.g.*, Bates Nos. 756, 826-829.[15] Clinicians have to speak slowly and in simple English for Simon to understand them, his cellmates have to complete his requests for medical care because he is unable to read and write well enough on his own, and others need to consistently advocate on his behalf. Bates Nos. 656, 669, 682-683, 248-251, 103, 756. The prison records describe a person whose adaptive functioning has improved since childhood, not a person who no longer has an intellectual disability.

Dr. Friedman diagnosed Simon with "mild intellectual disability" because of his moderately impaired adaptive functioning and moderately to severely impaired intellectual functioning. 1 RT 50-51. The Court finds this diagnosis persuasive. At the evidentiary hearing, Dr. Friedman testified that "mild" does not mean "there barely being a problem," but simply less severe compared to profoundly disabled individuals. 1 RT 51. Even judging entirely based on the degree and kind of deficits in adaptive functioning that Simon exhibits, his capacities and limits match perfectly those of people with mild intellectual disability. *See* DSM-5 at 34-35 (describing in detail the abilities and limitations in mental functioning exhibited by people with mild and moderate intellectual disabilities).

The Court finds that the DSM-5 sections on adaptive reasoning bolster Dr. Friedman's diagnosis. *See id.* While a diagnosis of intellectual disability requires deficits in at least one of three domains (conceptual, social and practical), Simon exhibits deficits

---

[15]     The Court considers the prison records a relevant and helpful part of the record presented in this case. It does not assume their accuracy, especially given the errors already noted and the state of health care in California's prisons over the last fifteen years. *See Brown v. Plata*, 131 S. Ct. 1910, 1923 (2011) ("For years the medical and mental health care provided in California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs.")

in all three. People with mild intellectual disability exhibit the following deficits in the conceptual domain: "For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed [...] in order to meet age-related expectations. In adults, abstract thinking, executive function (i.e. planning, strategizing), and short-term memory, as well as functional use of academic skills are impaired." *Id.* at 34. As a child, Simon struggled with school material, as evidenced by his grades in school and the reports of his family. Even though he has taken classes in juvenile detention and in prison, he is still unable to read and write proficiently—per Dr. Friedman's tests, his level of reading is equivalent to a child in second grade. Dr. Ferranti herself called him "illiterate" multiple times during her testimony. 2 RT 228-230. In fact, he exhibits every single impairment described in the DSM-5 section on conceptual domain: both experts found that his abstract thinking and executive functioning are impaired, his capacity to remember words is impaired, he needs help filling out forms in prison. Similarly, Simon's adaptive deficits in the so-called social domain closely track those of people with mild intellectual disability: as a child, he would "freeze and cry" when he was unable to follow instructions showing "difficulties regulating emotion and behavior in age-appropriate fashion"; as an adult, he is able to form friendships and even romantic relationships but is unable to interpret social cues accurately, as when he thought he had an understanding with his supervisor but turned out that he did not.[16] *Compare* Friedman Report at 3-4, *with* DSM-5 at 34-35. Lastly, his impairment in the practical domain is also characteristic of people with mild intellectual

---

[16]     The DSM-5 directly undermines Dr. Ferranti's opinion that someone with a disability would not be able to get involved in selling drugs. The DSM-5 includes the following in its description of social domain deficits associated with mild intellectual disability: "[t]here is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility)." DSM-5 at 34. Further, according to the DSM-5, gullibility and lack of awareness of risk, associated with intellectual disability, "may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse." *Id.* at 38. Assumptions made by Dr. Ferranti and presented with the certainty of a clinical diagnosis, even when they directly contravened guidelines in the DSM-5, directly undermined the credibility of her testimony.

disability. He is able to engage in personal care and recreational activities, such as watching TV and listening to music. He is able to work in jobs that "require limited conceptual or communication skills," such as jobs in the kitchen or as a porter.[17] DSM-5 at 34. And yet, just as the DSM-5 notes, he needs "considerable support from co-workers, supervisors, and others [in order] to manage social expectations, job complexities, and ancillary responsibilities."[18] *Id*. at 35. He needed help from his clinician in order to clear any misunderstanding with his supervisor, and he needed help contacting the education department in order to sign up for classes. Bates Nos. 826-829,

Considering the diagnostic criteria listed in the DSM-5, the evidence presented through the prison medical records, and the testimony of the parties' expert witnesses, the Court finds that Simon has met his burden of showing that he is in fact mentally impaired.

### B.     Porter's Mental Impairment Is So Severe That Between 2004 and 2009 He Was Unable To Rationally Understand The Need to Timely File And Unable Personally To Prepare a Habeas Petition.

This Court is next required to "evaluate the petitioner's ability to do *by himself* the two functions involved in complying with the AEDPA filing deadlines— i.e., understand the need to file within the limitations period, and submit a minimally adequate habeas petition." *Bills*, 628 F.3d at 1100 (emphasis added). In Part C below, the Court evaluates "petitioner's diligence in seeking assistance with what he could not do alone." *Id*.

Respondent relies on Simon's prison medical records and Dr. Ferranti's testimony to argue that Simon's mental impairment, if any, was not to severe that he was unable to understand the need to file a timely petition. Dr. Ferranti points out that Simon has been

---

[17]     While Dr. Ferranti testified that being a porter entails significant responsibility, the Court notes that in CDCR a "porter" is a general term used for inmates who are janitors (cleaning and moping floors), as well as a term used for inmates who carry supplies from one location to another. 2 RT 194. It is not a job that requires conceptual skills.

[18]     In fact, the Court notes some of Simon's adaptive deficits correspond better to the DSM-5 descriptions of the deficits shown in people with moderate intellectual disability, not mild intellectual disability. *See* DSM-5 at 35.

housed in general population, has had cellmates, and has been able to file requests for medical care on multiple occasions. In her opinion, even if Simon got help from cellmates to file those medical requests, he was clearly able to advocate for himself and thus could have sought assistance in filing a timely federal habeas petition. The Court finds that Respondent's argument suffers from a simple and fatal flaw: the fact that Simon is able to perform certain tasks does not mean that he is able to perform others. The very nature of his intellectual disability is such that he is indeed able to manage self-care, report when he is feeling pain, learn routines, engage in recreational activities, hold simple jobs and even make friendships. It is undisputed that his intellectual disability is not profound. But nor is the presence of a profound intellectual disability a criterion for eligibility for equitable tolling. The question before the Court is whether Simon was able to "rationally or factionally *personally understand* the need to timely file". *Id*. The Court finds that he was not.

There is ample evidence in the record that Simon is severely impaired in the areas of cognitive functioning associated with the timely filing of a habeas petition. The expert witnesses agreed that abstract thinking, executive functioning, multitasking, and some degree of reading or verbal comprehension are necessary for a person to understand the concept of a filing deadline in a habeas proceeding. First, Simon must understand that there were issues in his case that could be addressed through a pleading called a "habeas petition." Since Simon reads at a second grade level, it is impossible for him to have read and understood legal resources in prison. Any understanding he could have acquired about what a habeas petition is would have come from other inmates. Even then, his verbal comprehension is "extremely low," within the second percentile of the general population. Friedman Report at 6. It would be very challenging, if not impossible, for him to comprehend the abstract concept of a collateral challenge to a prison sentence that he is already serving. 1 RT 186 (Dr. Ferranti admitting that to file, Simon "must understand the language of what an appeal is.") His prison records show that he could not understand much more basic concepts, such as the need to take his anti-depressant medications

regularly or to keep a tube in his ear for a certain period of time. Even if he was told he could file something in court, he would have a hard time remembering the filing deadline or keeping accurate track of time. Although his working memory score was in the low average range, versus the borderline or extremely low range as with other key measures, the prison record shows that Simon consistently forgot information and instructions he was given.[19] Bates Nos. 682-683, 834-835, 930-931. Lastly, according to the experts' testimonies, the concept of a filing deadline requires multitasking. 2 RT 186 (Dr. Ferranti testifying, "your brain is multitasking when considering a filing deadline"); 1 RT 45 (Dr. Friedman explaining the need to keep in mind multiple tracks of information). Simon is severely impaired at multitasking, with a standard score of 51, which falls in the extremely low range and is worse than ninety-nine percent of the general population. Friedman Report at 7; 1 RT 47.

During the equitable tolling period, Simon did not have the cognitive capacity needed to understand the concept of a timely habeas filing. He did not have that capacity in 2005, when the statute of limitations expired, and he did not have that capacity in 2007, when a state habeas petition was filed on behalf. What changed was not a sudden improvement in his intellectual functioning, but rather the presence of jailhouse lawyers and willing cellmates, as discussed below.[20] In Dr. Friedman's clinical opinion, Simon suffers from a "lifelong developmental condition." Friedman Report at 1. While his intellectual functioning remains stable over time, he is likely able to learn the routines and basic rules of prison. 1 RT 55 (Dr. Freidman testifying that with support, disabled individuals "can learn routines" and certain tasks); 1 RT 130 (Dr. Friedman explaining that improvement in some areas of adaptive functioning do not cross-over to all areas of adaptive functioning).[21] But filing a habeas petition is not a simple task, nor is it part of a

---

[19]     Further, Simon's concept of time appears to be impaired, as evidenced by the fact that he could not remember when the tubes were placed in his ears. Bates Nos. 379, 536.
[20]     A jailhouse lawyer is an inmate who informally assists other inmates in legal matters though he/she has never practiced law or been trained as a lawyer. *See* Black's Law Dictionary, available at www.thelawdictionary.org.
[21]     Dr. Friedman testified regarding the difference between simple educable tasks and

prison routine that is "educable." 1 RT 55. To the contrary, it requires learning facts and applying those facts to other facts in a way that matches an abstract concept and may hypothetically result in a long-term benefit.

The Court finds that Simon also meets the second factor under the first prong of the *Bills* test—Simon's impairment was so severe that he was also unable personally to prepare a habeas petition and effectuate its filing. The experts agreed that Simon could not have personally prepared the state habeas petitions filed in his case for two separate reasons. First, Simon could not read and write well enough to prepare them. 2 RT 228-230 (Dr. Ferranti acknowledging possibility of Simon's illiteracy); 1 RT 80 (Dr. Friedman testifying that preparing the petitions filed is beyond Simon's academic achievement). Second, preparing and filing those petitions was simply beyond his intellectual abilities. Dr. Ferranti herself admitted that neither Simon nor anyone else with an I.Q. of 70 could have personally prepared the petitions "by themselves without assistance". 2 RT 232.

For these reasons, the Court concludes that Simon has satisfied his burden of demonstrating that his mental impairment was so severe that he was unable to personally understand the need to timely file and unable to personally prepare a habeas petition or effectuate its filing. His intellectual disability qualifies as an extraordinary circumstance beyond his control. *See Calderon*, 163 F.3d at 541 (holding that mental illness can constitute an extraordinary circumstance, sufficient to trigger equitable tolling). Simon's mental impairment was present throughout the tolling period of May 1, 2004 to November 29, 2009.

### C.  Porter Has Demonstrated Diligence in Pursuing His Claims.

To meet the second prong of the standard for equitable tolling, Petitioner must show "diligence in pursuing the claims to the extent he could understand them, but that the

---

complex intellectual tasks, such as legal filings. 1 RT 129-310 ("Improvement in following a program, following instructions from correctional officers, knowing when to show up for meals, knowing what rules of a setting are, being able to live in a cell, those are not necessarily going to carry over at all to those high-demand intellectual areas.")

mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance." *Bills*, 628 F.3d at 1100. Literal impossibility is not required. *Id.* at 1100; *see also Sossa v. Diaz,* 729 F.3d 1225, 1236 (9th Cir.2013) (holding that *Bills's* "impossibility requirement should not be strictly imposed because imposing extraordinarily high evidentiary standards on *pro se* prisoner litigants ... runs against the grain of [Ninth Circuit] precedent") (internal quotation marks omitted). The Ninth Circuit explained in *Harris* that it has granted equitable tolling "in circumstances where it would have technically been possible for a prisoner to file a petition, but a prisoner would have likely been unable to do so." *Harris v. Carter,* 515 F.3d 1051, 1055 n. 5 (9th Cir. 2008).

The "totality of the circumstances" inquiry in the second prong considers "whether the petitioner's impairment was a but-for cause of any delay." *Bills*, 628 F.3d at 1100. Petitioner would not be entitled to equitable tolling if his lack of diligence, rather than his mental impairment, caused the delay in filing. "With respect to the necessary diligence, the petitioner must diligently seek assistance and exploit whatever assistance is reasonably available." *Id.* at 1101. A petitioner's mental impairment "might justify equitable tolling if it interferes with the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure." *Id.* at 1100,

Respondent argues that Petitioner's filings during the equitable tolling period evince his capacity to secure assistance. It is undisputed that the state habeas petitions filed in his case were not prepared and filed by Simon himself—the record shows that he had assistance. Respondent asserts that since Simon was able to secure assistance in filing those petitions in 2007-2008, there is no explanation, other than his lack of diligence, for his failure to secure assistance in 2004-2005 while the one-year statute of limitations was running. Stated differently, if his mental impairment did not prevent him from filing in 2007, how did it prevent him from filing in 2004? Therein lays the crux of the problem and the key issue in this case. In reality, the answer is simple—assistance was "reasonably available" to Simon only at certain times and in certain institutions. *Bills*, 628 F.3d at

1100, 1101 ("the existence of […] help would be highly relevant to the question of whether a petitioner's mental condition made it impossible to file a timely petition.") Simon was sixteen when he pleaded no contest. He was briefly placed in an adult facility after sentencing, then moved to a youth correctional center, then transferred through a number of adult institutions. The record shows that in September 13, 2007, while housed in High Desert State Prison, he received assistance from Kevin MacGregor, a fellow prisoner. Pet. in Alameda Sup. Ct. at 20 (ECF No. 6, Ex. 1). He also received assistance in 2008 and 2009 with the filing of his other state petitions and his current federal petition. There is no evidence whatsoever to suggest that before 2007 "prison officials or […] other prisoners were readily available to assist [Simon] in filing" his petitions and that Simon refused to accept their assistance. *Bills*, 628 F.3d at 1101 (implying such circumstances would evidence a lack of diligence). The fact that he was transferred every year, if not every few months, prior to November 2007 implies that he did not stay in any facility long enough to be noticed by the few jailhouse lawyers who might be willing to assist a young mentally disabled prisoner. It is even more doubtful that assistance would have been offered at the juvenile facilities where he was temporarily housed since juvenile prisoners are even less versed in habeas law than their adult counterparts.

Simon suffers from a fixed and permanent mental impairment. He is illiterate, or close to it, and his executive functioning abilities are severely impaired. Friedman Report at 7; Ferranti Report at 7. The only way he could have filed a habeas petition is with assistance. 2 RT 232. The only way his constitutional claim would be heard by a court of law is if a habeas petition was indeed filed. If Respondent's argument was correct and the existence of a prior filing precluded a finding of diligence, then no prisoner with an intellectual disability could ever meet the second prong of *Bills*. There is no medication or treatment for intellectual disability. There is no improvement in symptoms that could explain why a prisoner filed recently and not in the past. And for disabled indigent prisoners, there is no available means of asserting their claims other than by seeking help from other inmates acting as jailhouse lawyers, who are few and far in between and whose

34

assistance can be unreliable and sporadic. It is must be circumstances such as these that the Ninth Circuit considered when instructing courts to take a "flexible," "case-by-case" approach in making equitable tolling determinations. *See Bills*, 628 F.3d at 1098; *see also See Lott v. Mueller,* 304 F.3d 918, 923, 924 (9th Cir. 2002) (holding that the determination of equitable tolling is " 'highly fact dependent' " and may "involve the confluence of numerous factors beyond the prisoner's control") (quoting *Whalem/Hunt v. Early,* 233 F.3d 1146, 1147 (9th Cir. 2000) (en banc)).

Based on the extensive record in this case, the Court finds that Simon was diligent in pursuing his claims to the extent that he could understand them, given his intellectual disability and the extent of assistance reasonably available to him. When jailhouse lawyers were available to review Simon's records and write petitions on his behalf, he was able to add his signature to those petitions.[22] When assistance was not available and explicitly offered to Simon, the record shows that Simon would not have been able to consistently search for it and obtain it. Simon's mental impairment "interfere[d] with his ability to understand the need for assistance, the ability to secure it [and] the ability to cooperate with or monitor the assistance [he did] secure." *Bills*, 628 F.3d at 1100. Dr. Friedman testified that while at times Simon received assistance, "that does not mean he can always know he needs assistance." 1 RT 149. Individuals "at his level" of mental impairment have a tendency to "mask" their impairment. *Id*. They "do not readily recognize how impaired they are" and thus they do not "consistently recognize when they need help." 1 RT 133 (further explaining that mentally disabled individuals may not "seek out assistance unless [...] they are encouraged to or somebody volunteers assistance..."). When Simon did receive assistance, he would have had difficulty monitoring that assistance because of his deficits in executive functioning. In Dr. Friedman's opinion, Simon "would have needed basically a constant manager, and he would not have been capable of making sure he

---

[22]     In fact, the record is replete with examples of Simon signing his name on forms he could not have personally read. *See, e.g.*, Bates Nos. 554 (consenting to dental treatment he did not understand), 834-835 (signing form for restoration of custody credits).

would have had constant management." 1 RT 233. Dr. Ferranti acknowledged that when Simon submitted timely pleadings, she had no way of knowing who was keeping track of the deadlines.[23]

Although not conclusively, Simon's prison records provide support for Dr. Friedman's evaluation of Simon's ability to seek assistance. With conceptually simple tasks, such as requesting pain medication, Simon was able to recognize that he needed help filling out and submitting medical request forms. Bates Nos. 248-251, 103, 307. With more complex tasks, such as creating a long-term plan, requesting education classes, or appealing a chrono, his clinician reported that Simon felt lost and confused. His clinician had to take over and complete those tasks for him. Bates Nos. 682-683, 834-835. Thus, in order to file a timely habeas petition, Simon would have been completely reliant on the will and skill of available jailhouse lawyers.[24]

The Court has carefully considered the cases cited in Respondent's briefs and finds them distinguishable from the case at hand. In *Yeh*, the Ninth Circuit denied equitable tolling because petitioner showed an awareness of basic legal concepts: "he was able to make requests for assistance from an appeals coordinator and an interpreter at his administrative hearings, and also to request assistance from a public defender after his conviction." *Yeh v. Martel*, 751 F.3d 1075, 1078 (9th Cir. 2014). Here, the experts agreed that any petitions or motions filed in Simon's case were written and filed by others. There is no evidence that any knowledge of legal issues raised in the filings came from Simon, rather than from the jailhouse lawyers themselves.[25] Similarly, unlike petitioner in *Bills*,

---

[23]     Regarding the pleadings that were filed in Simon's case, Dr. Friedman testified that "we have no way of knowing where Mr. Simon's understanding [ended] and where the person's understanding began." 1 RT 23.

[24]     In a statement to his clinician in 2012, Simon himself stated that he knew a couple of people who could help with his "appeals work" but still felt lost and "d[id] not know if he [was] doing things right." Bates No. 756.

[25]     The only note in the record, which shows Simon may have had some understanding of his case, was written in 2012, years after the relevant period for equitable tolling. At the end of a motion filed in support of Simon's appeal before the Ninth Circuit, inmate Robert Gonzalez wrote the following: "I am […] Simon's neighbor and he asked me to assist him in putting this motion together for him so that he could send it to the courts on time to submit good and relevant cases on his behalf." Resp't's Ex. 10 to Evid. Hr'g. Respondent

United States District Court
Northern District of California

Simon never represented himself at trial, called witnesses or demonstrated comprehension

of legal matters. *See Bills v. Clark*, 2012 WL 2263346, at *10, 19-20 (E.D. Cal. 2012).

And unlike petitioner in *Stancle*, Simon did not choose to delay the filing of his habeas

petitions because he was planning on securing assistance from other parties, such as the

Innocence Project or the Governor. *See Stancle v. Clay*, 692 F.3d 948, 959 (9th Cir. 2002).

Here, no independent evidence exists that Simon understood the legal concepts of a habeas

petition and a filing deadline at any point during the tolling period, nor that he could have

been any more diligent, given the absence of consistent assistance. As the Ninth Circuit

emphasized in *Bills*, "we should 'exercise judgment in light of prior precedent, but with

awareness of the fact that specific circumstances, often hard to predict in advance, could

warrant special treatment in an appropriate case.'" *Bills*, 628 F.3d at 1097 (quoting

*Holland*, 560 U.S. at 650). The specific circumstances of Simon's case warrant equitable

tolling and compel the Court to hear the merits of his constitutional claims. *See Lott*, 304

F.3d at 920 (warning against letting "procedural uncertainties unreasonably snuff out a

constitutional claim").

## CONCLUSION

For the reasons stated above, the Court holds that Simon has met his burden of

showing that his mental impairment was a circumstance beyond his control so severe that

it prevented him from understanding the need to file a timely petition and interfered with

his ability to secure assistance. Simon's intellectual disability, compounded by the absence

of reasonably available assistance, made it impossible for him to meet AEDPA's one-year

statute of limitations. The fully developed record in this case allowed the Court to

"exercise its equity powers" and make an *equitable* tolling determination in a fact-specific

---

is correct that the note raises doubt about Simon's inability to understand a filing deadline.
Any doubt raised, however, pales when compared to the substantial evidence presented in
the record that during the equitable tolling period, Simon's intellectual disability prevented
him from filing on time. Further, the Court takes into account Dr. Friedman testimony that
"we cannot glean [from the motion and attendant note] where Mr. Simon's understanding
began and the other person's input began." 1 RT 143-144.

manner. *See Holland*, 560 U.S. at 649-50 (eschewing a "mechanical rule" for determining extraordinary circumstances in favor of a "case-by-case" approach). The statute of limitations in Simon's case is thereby tolled from May 1, 2004 to November 29, 2009. Respondent's motion to dismiss the petition as untimely is DENIED. Simon's petition for writ of habeas corpus will be decided on the merits, as is necessary for justice to be served in this case.

Respondent shall file with the Court and serve on Petitioner, within sixty-three (63) days of the issuance of this Order, an Answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be granted. Respondent shall file with the Answer and serve on Petitioner a copy of all portions of the state trial record that have been transcribed previously and that are relevant to a determination of the issues presented by the Petition. If Petitioner wishes to respond to the Answer, he shall do so by filing a Traverse with the Court and serving it on Respondent within twenty-eight (28) days of his receipt of the Answer.

Pursuant to 18 U.S.C. § 3006A(a)(2)(B) and with good cause appearing, the Court appoints counsel to represent Petitioner in all further proceedings. If Petitioner's current counsel is unable to continue representation, Petitioner shall be referred to the Federal Public Defender's Office for its prompt selection of another qualified attorney. The Clerk of the Court shall provide a copy of this order to the Federal Public Defender's Office in San Francisco.

**IT IS SO ORDERED.**

Dated:  08/11/17

THELTON E. HENDERSON
United States District Judge