United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAR-NIQUE SIMON,<br><br>    Petitioner,<br><br>  v.<br><br>JASON SCHULTZ,<br><br>    Respondent. | No. C 09-05859 WHA<br><br>**ORDER ON MOTION TO DISMISS FOR LACK OF PROSECUTION** |

## INTRODUCTION

In this petition for a writ of habeas corpus filed more than a decade ago, respondent seeks to dismiss for lack of prosecution by petitioner, who has since completed his sentence for the conviction that gave rise to the petition in the first place.

## STATEMENT

**1.    INITIAL PROCEDURE IN FEDERAL COURT (2004 TO 2019).**

In 2004, Mar-Nique Simon pleaded nolo contendere in state court to attempted murder and second-degree robbery with use of a deadly weapon and was sentenced to 20 years in prison (Dkt. No. 1). Some appeals and petitions for writs were taken in state court but failed.

In 2009, Simon filed this petition for writ of habeas corpus in federal district court, initially *pro se*. The petition asserted (1) incompetence to enter a plea, (2) ineffective assistance of counsel under the Fourth and Fifth Amendments, and (3) ineffective assistance of counsel under the Sixth Amendment (*ibid.*; *see* Dkt. No. 129 at 6).

### A.  ORDERS RE TIMELINESS.

In 2011, Judge Thelton Henderson determined that the petition was untimely, dismissed it with prejudice, and entered judgment (Dkt. Nos. 10, 11). But, in 2012, our appellate court reversed and remanded for factual development to determine "whether Simon [wa]s entitled to equitable tolling based on a mental impairment" (Dkt. No. 18). On remand, Attorney Richard Tamor was appointed to represent petitioner, and he has done so ever since (*see* Dkt. Nos. 22, 222). (For her part, Attorney Michele Swanson of the California State Attorney General's Office has represented respondent since the petition's filing.)

In 2017, after five years of discovery into equitable tolling, Judge Henderson held two days of evidentiary hearings (Dkt. Nos. 94–95). Judge Henderson found petitioner eligible for equitable tolling and denied respondent's motion to dismiss (Dkt. No. 105).

The case was reassigned to the undersigned. And, in December 2017, respondent Warden Domingo Uribe filed his response (Dkt. No. 109). (The caption reflects that Warden Jason Shultz oversees California State Prison, Sacramento, where petitioner is now.)

### B.  ORDERS RE PROCEDURAL DEFAULT AND EXHAUSTION.

In July 2019, the undersigned determined there was cause and prejudice to excuse what otherwise would have been a procedural default in state court barring federal habeas review (Dkt. No. 129 at 7). Specifically, "petitioner[ had suffered from a] mental condition, near illiteracy, and lack of post-conviction counsel." These together had "rendered him completely unable to file his petition on his own or seek the help he needed" (*id.* at 10).

However, the judge found that petitioner might have failed to exhaust every ground of the petition in state court, so ordered a fresh round of briefing (*id.* at 11). Upon review, the judge found that the ineffective assistance of counsel ground had not been exhausted (Dkt. No. 137 at 3–4). The other two grounds might have been — it was not clear (*id.* at 4).

### 2. STAY AND STATE COURT PROCEEDINGS (2019 TO 2023).

So, on September 24, 2019, the Court stayed federal action and ordered petitioner to complete a state action to exhaust all three grounds in ten months (*id.* at 4), by July 2020.

#### A. PRIOR TO FILING IN STATE COURT.

It took sixteen months to file in state court.

*About three months* after stay, on December 22, 2019, petitioner was released on parole. For Attorney Tamor, this raised the question whether petitioner still wished to press for relief.

*Six months* after stay, in January 2020, petitioner's "counsel spoke with [petitioner] and there was an indication [petitioner] no longer wished to pursue this matter" (Dkt. No. 140 at 2).

*Eight months* after stay, the COVID-19 pandemic struck. While in-person visitation between client and counsel would not have been possible if the client had been incarcerated (Opp. 4 nn.1–3), the client was now on parole. Business continued apace in our courtroom, but ours was not where the action was to take place. (Respondent did not seek to dismiss.)

*Twelve months* after stay, in September 2020, petitioner's counsel for the first time requested from this Court an extension (Dkt. No. 151). The Court granted a continuance, with a status update due October 2020.

*Thirteen months* after stay, in October 2020, petitioner's counsel reported that petitioner had been rearrested on *fresh federal charges* for possessing ammunition (Dkt. No. 143). Petitioner's counsel considered with his client whether to keep pursuing his petition. He suggested that based on the sentencing guidelines any plea or conviction could, in his view, "moot [the] habeas petition because [petitioner] w[ould] no longer be on parole" (Dkt. No. 145 at 2–3 & n.1).

*Fifteen months* after stay, in December 2020, the Court requested a fresh update (Dkt. No. 147). Counsel reported that he "ha[d] had several Zoom conferences with [petitioner] regarding his desire to pursue his habeas corpus petition and the impact of a federal conviction on [its] viability" but that petitioner was not yet willing to dismiss (Dkt. No. 148 at 2–3).

However, at this time, counsel newly opined that petitioner's "mental condition ha[d] deteriorated and that [*petitioner wa*]*s not processing and understanding the information that*

3

*undersigned counsel* [*wa*]*s relaying to him*" (*id.* at 3 (emphasis added)). Counsel indicated an intent to appoint a *guardian ad litem* (*ibid.*). The Court was not told of any appointment.

*Sixteen months* after stay, in January 2021, counsel reported that "in light of Mr. Simon's inclination not to dismiss his habeas petition, undersigned counsel w[ould] concurrently undertake the task of exhausting the state claims" (*ibid.*). This account was not satisfactory. So, in February 2021, the Court asked why — despite a ten-month deadline to exhaust — petitioner had not filed any state court action even within sixteen months (Dkt. No. 149). Counsel stated an intent to file that month (Dkt. No. 150). This, too, was not satisfactory. The Court threatened dismissal if state charges were not filed that month, this in February 2021:

> The problem here is that the petition has three claims, one of which is unquestionably unexhausted. In September 2019, a prior order remitted all claims to state court, since the case for exhaustion of the other two was a "close call" (Dkt. No. 137). For over a year, petitioner's counsel has been promising to meet with his client because he thought his client did not want to pursue the habeas claim at all. *The Court was careful not to bless any delay.* Now, after more than 16 months, petitioner's counsel still has not filed any claims in state court and says he "targets" the end of February to do so (Dkt. No. 150). *With great reluctance, the Court will keep the case in abeyance until the end of this month, and if the state claims are not filed, the Court will dismiss.*

(Dkt. No. 151 at 1–2 (emphasis added)). A petition was filed on February 26, 2021 in the Superior Court of the State of California for the County of Alameda, Case No. HC145604-1 (*see* Dkt. No. 153; *cf.* Dkt. No. 178-1).

Notably, during this sixteen month period, respondent did not move to lift stay and dismiss the petition for failure to prosecute. The Court itself threatened this sanction, imposed a drop-dead deadline, and petitioner met the deadline.

### B. PROSECUTING IN STATE TRIAL COURT.

About two years were spent prosecuting in state court.

*Ten months* after filing the state-court petition, the Court directed petitioner's counsel to provide monthly status reports (Dkt. No. 164, 167). From July 2022 to June 2025, a total of 41 monthly reports were filed (*e.g.*, Dkt. Nos. 169–205).

4

*Thirteen months* after filing, on December 21, 2022, petitioner's parole in the criminal conviction at issue in this petition was terminated (Dkt. No. 218 at 2). Both sides now agree that under state law the state court thereafter lacked jurisdiction to decide the merits, but apparently neither side raised this issue at the time and the state court proceeded.

And, *twenty-six months* after filing the state petition, on April 20, 2023, the state court denied it on the merits (Dkt. No. 178 Exh. A).

### C. DECISION NOT TO APPEAL IN STATE COURT.

*Three months* after the denial, in July 2023, counsel was finally paid for prosecuting the petition in state court (Dkt. No. 179–181). He began "further investigation in light of the Superior Court's order" and started to draft an appeal (Dkt. No. 182; *see* Dkt. Nos. 182–83).

*About six months* after the denial (and ten months after parole terminated), in October 2023, Attorney Tamor discovered that the parole termination had deprived the state court of jurisdiction (*see* Dkt. Nos. 184, 201). This seemed to have been very similar to the issue that at one time Attorney Tamor had anticipated might result when the new federal charge had been brought (Dkt. No. 145 at 2–3 & n.1).

Attorney Tamor put aside any hope for state-court appeal (all agree this was proper). It was not yet clear to Attorney Tamor, however, what implication this would have for the scope of relief his client would still wish to seek, nor for the scope of relief possible in federal court.

### 3. STAY AND RETURN TO FEDERAL COURT (2023 TO 2025).

Thus began another two-year process — now of Attorney Tamor trying to communicate the state court developments to petitioner to inform next steps (*see* Dkt. No. 201).

### A. NOT IN CUSTODY.

#### (i) Seeking to Discuss Results and Goals.

*For seven months*, from October 2023 through April 2024, Attorney Tamor tried to reach Simon. He tried an average of three times a month for seven months (Dkt. Nos. 184–90). In May 2024, Attorney Tamor finally reached Simon (Dkt. No. 191 at 3). A conflict emerged. Simon "indicated his desire to continue to pursue his habeas corpus petition" (*ibid.*). Attorney Tamor, however, believed jurisdiction had been destroyed both as to the state proceeding *and*

as to the federal one — and told his client he wished to show him written materials supporting this result (presumably to be read by someone else to petitioner).

### (ii)   Seeking to Send Files re Mootness.

*For four or five months*, Attorney Tamor could not find a way to send these files to Simon. He attempted to reach Simon in June 2024, but was rebuffed by a bad address (Dkt. No. 192 at 3), then tried again in July 2024 but "was apparently unsuccessful" (we are not told why) (Dkt. No. 193 at 3). He finally conferred with his client in August 2024 while planning to re-send the materials in September 2024 (Dkt. No. 194 at 3), before getting sick in September 2024 while planning to send the materials in October 2024 (Dkt. No. 195).

Notably, respondent still did not move to dismiss for failure to prosecute.

### B.   IN CUSTODY.

On September 13, 2024, Simon was arrested on *fresh state charges* for domestic violence and put into custody in Sacramento County Jail (Dkt. No. 196 at 3). Attorney Tamor discovered this shortly thereafter.

### (i)   Criminal Proceedings.

*For about five months*, from October 2024 through February 2025, Attorney Tamor did not seek to contact Simon while the criminal matter was adjudicated (Dkt. Nos. 197–200). On February 7, 2025, Simon was convicted. And, on March 13, 2025, Simon was transferred to North Kern State Prison (Dkt. No. 203).

### (ii)   Transfers Prior to Motion to Withdraw.

*For about four months*, from March 2025 through June 2025, Attorney Tamor *did* try to contact his client but could not pin him down. He tried state correctional records and friends and family (Dkt. Nos. 201–02). Then he hired a private investigator who located petitioner in North Kern State Prison (Dkt. No. 203). At some point, Simon was transferred to California State Prison Sacramento. And, in June 2025, Attorney Tamor requested time to meet him there (Dkt. No. 205). In July 2025, they met (Dkt. No. 207). Attorney Tamor confirmed Simon wanted to proceed, meaning he believed there was now a robust conflict between attorney and client.

6

*For three months*, Attorney Tamor prepared to withdraw based on the belief the federal court lacked jurisdiction and he could not pursue frivolous relief (Dkt. Nos. 208, 210).

### (iii)   Motion to Withdraw.

In September 2025, Attorney Tamor served his motion to withdraw upon his client (Dkt. Nos. 211, 214).

*For three months*, from September 2025 through November 2025, Simon did not contact his counsel nor the Court respecting the motion to withdraw (*see ibid.*). However, in July and again in September, petitioner submitted *pro se* a letter and then a notice and demand for jury trial in another matter in our district court (Opp. 8). *See United States v. Simon*, No. 21-cr-0352-JSW, Dkt. Nos. 112 & 113 (N.D. Cal. filed July 22 & Sept. 29, 2021). Our record tells us little about these submissions, such as whether they were made by petitioner himself or with assistance from someone else, or why.

Notably, respondent did not move to terminate the action for lack of jurisdiction.

The undersigned called a status conference to sort things out.

*          *          *

On November 13, 2025, we held the conference. At the hearing, counsel for respondent, Attorney Swanson, stepped forward to say that there *was* a basis for jurisdiction — though respondent believed the petition should be dismissed for lack of prosecution anyway (*see* Dkt. No. 217). After the hearing, Attorney Tamor agreed there was a jurisdictional basis for proceeding and withdrew his motion to withdraw (*see* Dkt. Nos. 218, 219).

Now, respondent moves to dismiss for failure to prosecute. This order follows full briefing and argument.

### ANALYSIS

Under Rule 41(b), a district court may dismiss an action if its proponent fails to comply with court orders or fails to prosecute without unreasonable delay. *Nealey v. Transportacion Maritima Mexicana, S.A.*, 662 F.2d 1275, 1280 (9th Cir. 1980). When considering dismissal,

> the Court must weigh the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to

7

>defendants/respondents; (4) the availability of less drastic alternatives; and (5) the public policy favoring disposition of cases on their merits.

*Pagtalunan v. Galaza*, 291 F.3d 639, 641 (9th Cir. 2002).

1. **THE PUBLIC'S INTEREST IN EXPEDITIOUS RESOLUTION?**

"The public's interest in expeditious resolution of litigation always favors dismissal." *Id.* at 642 (quoting *Yourish v. California Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999)). Here, both sides agree it does here (Reply 3 (citing Opp. 15)).

2. **THE COURT'S NEED TO MANAGE ITS DOCKET?**

"The trial judge is in the best position to determine whether the delay in a particular case interferes with docket management and the public interest." *Id.* at 642.

Rarely has the docket in this action suffered from non-compliance — a more significant and time-consuming problem than delay alone. Yes, when the Court imposed the stay and ordered that petitioner complete a petition in state court in ten months, petitioner did not abide. But respondent did not bring this to the Court's immediate attention nor seek dismissal. And, as soon as the Court threatened such a result through a fresh order, petitioner complied.

This petition has, however, suffered from successive delays. "In our judicial system, many delays are of an acceptable duration; others, though lengthy, may be unavoidable. Where these exist, there is no basis for a dismissal." *Nealey*, 662 F.2d at 1280. Here, not all the delay was unavoidable, but much of it was understandable given the exceptional confluence of unusual circumstances, limited petitioner competence, and conflict between petitioner and counselor.

Much of the delay coincided with a global pandemic. Some coincided with active proceedings in two fresh criminal matters, too, though this was less unusual. More importantly, all this delay coincided with petitioner confronting these challenges with below-average capacity. *Recall that earlier in this action, evidentiary findings established that petitioner had been entitled to equitable tolling at the time of filing his petition because of such limitations.* In the present motion, respondent presents *no* reason to discount that such limitations persist, and respondent presents *no* convincing reason to disconnect them from the

8

causal chain leading to the recent delays (keeping in mind that in this posture it is respondent who seeks extraordinary relief — to foreclose adjudication on the merits). Yes, petitioner has been represented by counsel for all periods at issue. Yes, that ordinarily would have disconnected the problem of mental competence from the problem of further delay in prosecution — the purpose of the appointment. But one more unusual circumstance coincided: For much of the period at issue, petitioner's counsel appeared in good faith to believe that the benefits of pursuing relief and even the ability to pursue relief at all had changed so dramatically that this required robust communication with the client and eventually required even his withdrawal. This client-counselor conflict plausibly thrust to the fore the problem of mental competence given that the client became required to participate but apparently could not. Attorney Tamor now acknowledges that he was mistaken in his views, and that this mistake compounded the delay. A court must be mindful if "the fault lies with the attorney rather than the litigant." *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981).

The confluence of these three factors will rarely recur, if ever. Unsurprisingly, respondent points to no situation where dismissal has been ever before considered in a situation like ours. This factor points *against* dismissal.

3.  **THE RISK OF PREJUDICE TO RESPONDENT?**

"To prove prejudice, a [respondent] must establish that plaintiff's actions impaired [respondent]'s ability to proceed to [a merits disposition] or threatened to interfere with the rightful decision of the case." *Pagtalunan*, 291 F.3d at 642. Whether litigation pends for some lengthy period is not the point; instead, what matters is whether the delay is both unreasonable *and* results in some prejudice for respondent. *Ibid.*

As above, much of the delay was reasonable under the unusual circumstances outlined. So, much of the delay does not weigh much for this factor. That said, some delay was unnecessary. And, while petitioner is right that respondent has not pointed to specific evidentiary loss from any such delay (Opp. 15–16), petitioner is wrong that pointing to specific loss is required: "Unnecessary delay *inherently* increases the risk that witnesses' memories will fade and evidence will become stale." *Id.* at 643. Any unfair prejudice to respondent,

9

however, can be further limited by ordering prompt adjudication on the merits — and the district judge can weigh the risk that critical evidence was lost to any extent appropriate.

This factor points nowhere — it's neutral.

4. THE AVAILABILITY OF LESS DRASTIC ALTERNATIVES?

This factor favors dismissal only if after unreasonable delay and failure to follow court orders the Court raises alternatives to dismissal, considers those alternatives, but concludes they cannot solve the problem of non-prosecution by any lesser sanction than dismissal (whether because compliance is futile or because compliance has been ordered but then failed). *Cf. Id.* at 643 & n.1 (discussing caselaw before and after *Yourish*, 191 F.3d at 990).

Here, the Court earlier warned petitioner to redouble efforts to prosecute by filing his petition in state court within the month or face dismissal (Dkt. No. 151). Petitioner filed in state court (Dkt. No. 153). When the Court imposed other orders, counsel complied. At present, there is no non-compliance. Compliance will not be futile. Now that counsel is back on board, prompt prosecution is expected.

Indeed, as an alternative to dismissal, petitioner proposes that the Court order dispositive briefing on a tight timeline with the evidentiary record as it stands today. This is a sensible alternative. Indeed, at our hearing, respondent lapsed into explaining the various reasons why petitioner's merits positions were so poor. If so, then explaining these merits fully should be a sensible alternative pathway for respondent to reach the closure it seeks.

This factor points *against* dismissal.

5. THE PUBLIC POLICY FAVORING DISPOSITION OF CASES ON THEIR MERITS.

Because the alternative to dismissal is a merits decision, and because deciding actions on their merits is always preferred, this factor points *against* dismissal.

\*       \*       \*

"[D]ismissal is a harsh penalty and, therefore, it should only be imposed in extreme circumstances." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir. 1992). In *Pagtalunan*, "[t]hree factors favor[ed] dismissal and two factors weigh[ed] against dismissal," making the question a "close case." 291 F.3d at 643. But for the rare confluence of circumstances pointed

10

out on the second factor, this petition might go the way of *Pagtalunan*. But the rare confluence of circumstances did occur, and respondent failed to address mental competence especially — the motive force of this petition and its procedure, which under the circumstances especially of attorney-client conflict may explain delay. The Court declines to exercise its discretion to dismiss the petition under Rule 41(b).

Note well that this order makes no renewed evidentiary finding as to petitioner's mental capacity. To the extent petitioner's mental capacity becomes an issue on the merits of the petition — for instance, as to whether there was good cause to excuse any procedural default in the state court — *this order should not be cited as a basis for finding that there was good cause (or not)*. This order has *not* found either way. Rather, this order sits in its own posture: In this motion, respondent seeks extraordinary relief from having to face the petition at all. The burden is different on the merits. *This order takes no position on the merits*.

## CONCLUSION

For the reasons above, the motion (Dkt. No. 220) is **DENIED**. To limit prejudice to *respondent* from any further delay, *respondent* **SHALL** bring a motion seeking to dispose of this petition on the merits **BY NOON ON FEBRUARY 27, 2026**. And, pursuant to *petitioner's* proposed alternative to dismissal in the opposition filed on this motion, that being to proceed to the merits on the record as it stands (Opp. 17:23–18:4 ("This is an appropriate sanction . . . .")), this order finds that *petitioner* has **WAIVED** any further evidentiary development that would delay respondent's ability to meet respondent's deadline or petitioner's ability to meet petitioner's resulting briefing deadline.

**IT IS SO ORDERED.**

Dated: December 30, 2025.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE